## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| **BARBARA ZUBROW,** | : | |
| | : | |
| **Plaintiff** | : | |
| | : | |
| **v.** | : | **Civ. No. 03CV1929 (WWE)** |
| | : | |
| | : | |
| **SOLVAY PHARMACEUTICALS,** | : | |
| | : | |
| **Defendant.** | : | |

_____ **RULING ON PENDING MOTIONS**

Plaintiff Barbara Zubrow brought this action against her former employer Solvay Pharmaceuticals after it terminated her employment.  In her eight count complaint, plaintiff asserts federal claims of age and religious discrimination in violation of the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 621 et. seq., and Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq..  She asserts state law claims of age and religious discrimination in violation of the Connecticut Fair Employment Practices Act ("CFEPA"), breach of implied contract, negligent misrepresentation, retaliation pursuant to Connecticut General Statutes § § 31-51m and 31-51q, and defamation.

Defendant has filed a motion for summary judgment [doc. #44] on the complaint in its entirety, and a motion to strike portions of the plaintiff's declaration [doc. #53] filed in support of her opposition to the motion for summary judgment.  Plaintiff has filed a motion to strike portions of the declarations of defendant's employees Mark Banks, Joanna Scott, Tina Fuller and Danielle Milton [doc. #55], and a motion entitled "Motion Re Defendant's Hearsay Statements in Support of its Motion for Summary Judgment" [doc. #63].

**BACKGROUND**

The parties have submitted statements of fact, affidavits, and exhibits, which reveal the following undisputed facts.

Defendant is a pharmaceutical company headquartered in Marietta, Georgia. Plaintiff was hired by defendant as an Associate Sales Representative effective January 16, 2001.

At all times relevant to this action, Tricia Guiry, a District Manager, was plaintiff's direct supervisor.  Chuck Christophel, Regional Business Director, was Guiry's direct supervisor.

Plaintiff's Responsibilities as a Sales Associate

As an Associate Sales Representative in defendant's Primary Care sales group, plaintiff was responsible for selling three of defendant's products:  Aceon, Teveten and Androgel.  Plaintiff and two other sales representatives, Tim Devlin and Richard McQuatters, worked in what was referred to as a "pod" in the area of Hartford, Connecticut.

As an Associate Sales Representative, plaintiff was expected to make sales calls on physicians during the business day.  During sales calls, plaintiff was responsible for exchanging information with physicians about their practices and defendant's products; and for providing physicians with product samples.  Plaintiff was also required to satisfy certain daily administrative responsibilities.

Defendant's Standard Operating Procedure ("SOP"), which assured compliance with Federal Drug Administration ("FDA"), guidelines required that sales representatives

fill out a Prescriber Activity Card ("PAC") whenever samples of defendant's

pharmaceutical products were to be given to a licensed practitioner.[1]

The job description for the Associate Sales Representative position stated:

The following are essential job account abilities:

1.    50%    Performs sales calls to doctors, utilizing all elements of a successful sales call process, including:  Use of PSS Rx, pre-call planning, post call review, proper call routing all while meeting reach and frequency call of objectives as set by the District Manager.

2.    45%    Completes all administrative responsibilities.  These include transmitting daily to perform electronic sales system update and e-mail exchange, management of samples as per PDMA [Prescription Drug Marketing Act]  SOP's, monitoring communication lines per management direction, properly using promotional funds and marketing programs.

3.    5%     Performs other duties as assigned or requested.

The SOP delineated that the PAC needed to show exactly what products and

what amounts were being provided to each physician.  The SOP provided:

A)    The Practitioner's signature must be obtained on the PAC when samples are to be left or a stock package is requested.

B)    All information fields on the PAC must be completed before obtaining practitioner's signature.

C)    The [Sales Representative] is required to witness the licensed practitioner signing the PAC when samples are distributed or stock package requested.  Signature stamps are not acceptable.

D)    Not witnessing the practitioner's signature is a violation of company policy.

_____

[1]On March 30, 2001, plaintiff signed a form indicating that she had "received, read and will comply with" defendant's SOP for sample accountability.

The information fields that the SOP required included, inter alia, the prescriber's first and last name, address, and state license number.  In accordance with the SOP, once the representative marked the sample quantities and lot numbers distributed, these entries could not be altered in any way through erasures, whiteouts or cross outs. The SOP directed sales representatives to tear up a PAC if a mistake occurred in filling out the number of samples left.

Representatives did enter on occasion erroneous sample amounts, and Solvay allowed them to make a corrective entry into software that reconciled any difference between the physical and computer inventory.  However, Guiry explained that she would consider that a representative had a performance problem if he or she consistently incurred such errors.

Danielle Hughey (now Danielle Milton) was responsible for ensuring sales representatives' compliance with their responsibilities relative to the PACs.  When a representative made an error on a PAC, she would send that representative a "PAC Error Memo."  Hughey copied Guiry on each of these PAC memos.

Plaintiff's Performance as a Sales Representative

On February 15, 2001, Guiry observed plaintiff's work and indicated on an evaluation form that plaintiff had met expectations in all areas.  In a comment section, she praised plaintiff's performance.  However, Guiry later noticed performance problems in plaintiff's daily communications and compliance with defendant's SOP for sample accountability.

Plaintiff received several PAC Error Memos from Hughey.  PAC Error Memos dated April 20, 2001, May 18, 2001, and June 21, 2001 indicated that the PACs

prepared by plaintiff had been altered in contravention of defendant's policy.  Hughey

sent plaintiff PAC Error Memos on June 26, 2001, July 9, 2001, September 13, 2001,

October 9, 2001 and October 15, 2001.  These memos informed plaintiff that she had

not filled in certain information such as the prescriber's full name and address or lot

number.

In June and July 2001, Guiry reviewed plaintiff's computer entries and noted that

plaintiff was not synchronizing her laptop computer with defendant's Insight program on

a daily basis as required.[2]  Additionally, after an investigation into plaintiff's work, Guiry

believed that some of the physician visits plaintiff had recorded were for physicians who

were retired or were not in the office on the dates for which plaintiff had recorded visits.

In a meeting with plaintiff on July 25, 2001, Guiry discussed the questions she

had about certain of plaintiff's recorded physician visits. In a follow-up e-mail to plaintiff

dated that same day, Guiry asked plaintiff to document her reasons for recording

certain calls to Dr. Lawrence Koch on April 16 and July 13, 2001, Dr. Stephen Doctoroff

on July 11, 2001, Dr. Gerald McAuliffe on July 11, 2001, and Dr. Charles Leach on

June 29, 2001.

In a document dated July 26, 2001, plaintiff wrote:

As regards the particular three doctor's visits, two are due in part to Tricia's
confusing directions to deal with meeting with Physician's Assistants in a doctor's
office.  For two I meet with the PA's and as there is no way to indicate detailing
them, I put the doctor's name as being visited.  The third person in question was
on vacation.  In that office there are six doctors.  I filled in the form in the
evening, and I believe put down the wrong doctor as having been seen.  That is
my recollection.

---

[2]Insight is defendant's centralized computer program.

In an e-mail to Guiry dated August 1, 2001, plaintiff explained further that she had mistakenly marked down the names of doctors Koch and Doctoroff because she had "mixed up faces with names;" she had spoken to a doctor without seeing his face and had erroneously assumed it to be Dr. McAuliffe; and she may have erroneously indicated in the computer the retired Dr. Charles Leach of New Britain rather than the active Dr. Charles Leach of Glastonbury.  She concluded with:

> I appreciate the need for accuracy and am sorry for these errors.  Clearly the errors were an accident.  I believe a change from inputting data at the end of the day, to inputting right after each visit can reduce the chance of such errors occurring in the future.

On July 26, 2001, Joanna Scott, a PDMA Auditor in defendant's Compliance Department, conducted an on-site audit at plaintiff's sample storage facility.  The Audit Report, a copy of which was sent to plaintiff by e-mail on July 30, 2001, stated that plaintiff's "[o]verall sample accountability for the time frames covered was found Unacceptable."  The Audit Report noted eleven distribution errors, ten sample discrepancies, and four strike overs with regard to sample quantities on plaintiff's PACs. Scott observed that plaintiff's storage facility contained unopened boxes, which "could lead to possible discrepancies due to conflicting totals from boxes and invoices."   She noted that plaintiff had failed to complete her reconciliation reports, had failed to perform properly the corrective loss/gain procedure, and was utilizing improper record keeping methods. She recommended that plaintiff check distribution entries on the computer, perform physical inventories, check information and quantities marked on the PAC before leaving a practitioner's office, and file all PACs, hard copies of weekly reconciliation reports and other documentation for the past three years.  Scott

requested that plaintiff respond to the audit report within thirty days.  On September 21, 2001, Scott e-mailed plaintiff because she had not yet received a response from plaintiff.  Plaintiff did furnish Scott a response on September 25, 2001.

In July 2001, Scott and Tina Garrett Fuller, another PDMA Auditor of defendant's Compliance Department, conducted an audit and verification process of some of the PACs that plaintiff had submitted.  They faxed certain PACs to the named physicians on the PACs for signature verification.  Scott and Fuller learned that the signature of two doctors on two PACs did not appear to be that of the doctor.  Another doctor reported that the signature appeared to be his but that he had not been in the office on the date indicated on the PAC.

On August 30, plaintiff met with Guiry and another Solvay supervisor, Chuck Christophel.  During this meeting, plaintiff was presented with a Final Written Warning and a Performance Improvement Plan ("PIP").

The Final Written Warning stated that plaintiff would be "required to adhere to the attached Performance Improvement Plan for a minimum of the next 90 days," and that "lack of improvement...in these areas may result in further disciplinary action up to and including termination of employment."  The PIP set forth ten different areas for plaintiff's performance to improve, including following all "SOPs pertaining to sampling and sample accountability..." and communicating to Guiry all "time out of territory...prior to taking via voicemail and email."

On October 3, 2001, Guiry sent plaintiff an e-mail regarding plaintiff's performance relative to the areas listed on the PIP.  The e-mail noted that plaintiff had failed to satisfy certain administrative expectations of the PIP, such as providing full

7

information for the tracking reports of her planned customer calls, having daily voicemail communications with Guiry upon entering and leaving the field, furnishing forms and responses in a timely manner, and following SOPs pertaining to sampling and sample accountability.

On October 8, 2001, plaintiff responded to Guiry's evaluation in an e-mail, remarking that the evaluation report should have been sent within a day or two of September 19, 2001 (thirty days from her receipt of the PIP).  She wrote, "Please complete the next evaluation on time, so we can measure improvement.  Thank you."  She explained that during the first two weeks of the PIP, she was "overloaded with new procedures and fell short on some items."  She represented that she had filed a certain form in a timely manner but that Guiry must not have received it or "failed to properly file" it, but that she had not known of the deadline for return of another form.

In a letter dated October 8, 2001 to Dr. Harold Shlevin, defendant's President and CEO, plaintiff represented that an "illegal practice" was occurring when pharmaceutical samples were delivered to plaintiff's home without the requisite signature acknowledging receipt.  Plaintiff based this allegation solely on her belief that an actual person was supposed to sign for any sample delivery of prescription drugs delivered to a home.  In 2001, plaintiff received only product samples of Aceon and Teveten, both of which are not controlled substances requiring heightened restrictions on transport and handling.

Plaintiff's Requests for Leave

In June 2001, plaintiff left Guiry a voice mail indicating that she would be undergoing surgery prior to the meeting and might not be able to attend a mandatory

8

meeting scheduled for June 25 through 27, 2001.  Guiry required plaintiff to fax her a letter from her doctor stating the reason and days that plaintiff would need to miss work.  Plaintiff's doctor did provide such letter to Guiry, and plaintiff missed the mandatory meeting.

In July 2001, plaintiff told Guiry that she wanted to take some time off to be with her daughter, who was undergoing a difficult pregnancy.  Guiry told plaintiff that she had already used most of her vacation days and that she had only a few days of leave remaining.  Plaintiff then contacted David Lacewell at defendant's Human Resources Department to find out about defendant's family leave policy.  During her discussion with Lacewell, plaintiff mentioned that at the end of a training meeting in March, Guiry had told her that she liked "to hire young people" and that she believed that Guiry was withholding approval for her leave due to her preference for younger people.   Plaintiff was ultimately given two weeks off, including five days of unpaid leave, to be with her daughter.

On September 20, 2001, plaintiff spoke with Lacewell by telephone about taking unpaid time for Rosh Hashanah.  During this conversation, plaintiff asserts that Lacewell wanted to discuss her PIP, and also asked her to explain how and when she expected to celebrate the holiday.

Offended by Lacewell's questions about the holiday, plaintiff made a complaint to the Anti Defamation League, which subsequently wrote a letter to defendant's president.[3]

---

[3]Plaintiff was also offended by Guiry's alleged response to plaintiff's comment that some Jewish physicians had complained about programs scheduled for Saturdays.

In October 2001, defendant hired an outside investigator, attorney David Fried, to interview plaintiff and other employees relative to plaintiff's assertions of discrimination based on age and ethnicity.  During the pendency of this investigation, plaintiff was placed on a paid leave of absence.  Fried concluded his investigation with a report dated November 21, 2001.

Mark Banks, defendant's Vice President of Human Resources, also conducted an internal investigation of plaintiff's assertions of discrimination and illegal sample delivery.  As part of this investigation, he contacted plaintiff to ask that she return her company-provided laptop computer so that defendant could determine whether it contained any relevant information or documents.  Plaintiff asserts that she asked Banks for an assurance that she would receive a copy of the hard drive prior to agreeing to return it to defendant.

Defendant's internal investigation found no basis to plaintiff's claims of discrimination or illegal sample delivery methods.  However, after the internal investigation, Banks had gained concerns about plaintiff's work performance.  On January 3, 2002, Banks informed plaintiff that her employment was to be terminated effective January 8, 2002.

## DEFENDANT'S MOTION TO STRIKE

Plaintiff has submitted an affidavit in support of her opposition to summary judgment.  Defendants have moved to strike portions of plaintiff's affidavit as not in compliance with Rule 56(e).

---

Plaintiff asserts that Guiry stated that "Jews don't observe" the Sabbath.  However, Guiry denies having made this statement.

Rule 56(e), partially entitled "Form of Affidavits," requires that supporting and opposing affidavits "shall be made on personal knowledge," and "shall set forth such facts as would be admissible in evidence...."

Accordingly, when portions of an affidavit do not comply with Rule 56(e), the trial judge is "free to disregard the inadmissible paragraphs and consider the rest of the affidavit." United States v. Alessi, 599 F.2d 513, 515 (2d Cir. 1979). A court may therefore strike portions of affidavits which are not made upon the affiant's personal knowledge, contain inadmissible hearsay or make generalized and conclusory statements. See, e.g., United States v. Private Sanitation Industry Ass'n of Nassau/Suffolk, Inc., 44 F.3d 1082, 1084 (2d Cir.), cert. denied, Ferrante v. United States, 516 U.S. 806 (1995) (affidavit not made on personal knowledge will not suffice to create issue of fact precluding summary judgment); H. Sand & Co. v. Airtemp Corp., 934 F.2d 450, 454-55 (2d Cir. 1991) (hearsay testimony that would not be admissible if testified to at trial may not properly be set forth in the Rule 56(e) affidavit); Weeks v. ARA Services, 869 F.Supp. 194, 196 (S.D.N.Y. 1994) (generalized and conclusory affidavits are insufficient to withstand defendant's motion for summary judgment). To the extent that a Rule 56(e) affidavit contains inadmissible hearsay which references other evidence that is properly before the court, the court may disregard the hearsay but separately consider the admissible evidence. John Hancock Property and Casualty Insurance Co. v. Universale Reinsurance Co., Ltd., 147 F.R.D. 40, 45 (S.D.N.Y. 1993).

The Court will hereby strike the following portions of plaintiff's affidavit containing inadmissible hearsay, generalized conclusory statements, and/or information which could not be attributed to plaintiff's personal knowledge: paragraphs 6, 8, and 45

11

regarding expectations of District Managers and other sale representatives' compliance with defendant's policies and SOPs; paragraphs 46 and 55 regarding Tricia Guiry's alleged statements to various people and the Connecticut Commission on Human Rights and Opportunities; paragraphs 52, 53, and 54 regarding Tricia Guiry's statements about her preference for hiring younger individuals reported by Fried in his report; and paragraphs 23 and 62 regarding Guiry's reasons for preferring to hire younger individuals and her retaliatory motivations.

The Court has not granted defendant's motion as to all portions requested to be stricken.  However, the Court considers all the remaining averments in light of the evidentiary record as a whole in determining the existence of factual disputes.

## PLAINTIFF'S MOTION TO STRIKE

Plaintiff seeks to have the court strike portions of the declarations of Banks, Scott, Fuller and Milton submitted in support of defendant's motion for summary judgment.

Plaintiff requests that the Court strike as based on hearsay:  paragraphs 12, 13, 19, 20, 22, 23, 25, and 26 of Banks' declaration, which concern the conclusions that he derived from his internal investigation, his references to his review of Fried's report, the reasons for plaintiff's termination; paragraphs 11 and 16 of Scott's declarations concerning her finding of plaintiff's non-compliance with federal regulations and statements she received from doctors during the verification process of plaintiff's PACs; and paragraphs 6 and 7 of Fuller's declaration concerning the response she received from a doctor's office, the verification of plaintiff's PACs and the fact that she had informed Guiry of PAC cards that appeared to be falsified or questionable.  Plaintiff also

12

seeks to strike as hearsay Fried's report, the termination memo attached to Banks' declaration, and faxes from a doctor's office indicating that the signature on the PAC was not that of the doctor.

The Court finds that the statements and exhibits sought to be stricken do not constitute hearsay since they are not offered to prove that the statements contained therein are true, but are indicative of the motivation for the decision to terminate plaintiff's employment.  See Cameron v. Community Aid for Retarded Children, Inc, 335 F.3d 60, 65 (2d Cir. 2003) (reports received by Executive Director concerning employee performance were not hearsay since reports were used to establish Executive Director's state of mind).  Accordingly, the Court will not strike these portions of the affidavits.

Plaintiff seeks to strike as conclusory statements by Banks regarding his investigation conclusions, and the reasons for the decision to terminate plaintiff's employment.  The Court finds that, with the exception of paragraph 26, Banks' statements are supported by the evidentiary record and are indicative of his state of mind.  For identical reasons, the Court declines to strike the requested portions of the declarations by Scott, Fuller and Milton. The Court will strike paragraph 26 of Banks' affidavit, which paragraph states in conclusory terms that plaintiff's termination was not discriminatory.

The Court will not strike the portions of the affidavits that plaintiff asserts are misleading or that mischaracterize or contradict the record.  The Court finds that these averments are not misleading or belied by the evidentiary record.  However, the Court recognizes that Banks' asserted statement that plaintiff "refused" to return the company-provided lap-top fails to indicate that plaintiff stated that she needed to make

13

a copy of the lap-top's contents before returning it to defendant.  The Court relies upon the evidentiary record as a whole in determining the undisputed facts.

Accordingly, plaintiff's motion to strike is granted in part.

### PLAINTIFF'S MOTION RE DEFENDANT'S HEARSAY STATEMENTS

Plaintiff requests the Court to order the defendant "to indicate to the court which of the statements made by its affiants, declarants and employees" were not offered by the defendant for the truth of the matter asserted.  The Court does not require this assistance.  However, the motion devotes considerable length to substantive arguments against the motion for summary judgment and provides additional evidentiary submissions in support of her assertion of pretext.  Accordingly, the Court will construe the instant pleading as a motion to supplement plaintiff's opposition to summary judgment, which motion will be granted.  Defendant has already provided a response to these additional arguments and evidentiary submissions and, therefore, it will incur no prejudice as a result of this ruling.

Plaintiff submits a list of other employees who received unacceptable audit results in New York, Connecticut and Massachusetts in 2001.  According to this evidence, three other employees age 25, 29, and 32 received "unacceptable" ratings on their audits.  Only one of these three other employees was terminated.

Plaintiff has also provided PAC Error Memos for other employees reporting to Tricia Guiry during 2001 between June and November 2001.

### SUMMARY JUDGMENT

A motion for summary judgment will be granted where there is no genuine issue as to any material fact and it is clear that the moving party is entitled to judgment as a

14

matter of law.  Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).  "Only when

reasonable minds could not differ as to the import of the evidence is summary judgment

proper."  Bryant v. Maffucci, 923 F. 2d 979, 982 (2d Cir.), cert. denied, 502 U.S. 849

(1991).

    The burden is on the moving party to demonstrate the absence of any material

factual issue genuinely in dispute.  American International Group, Inc. v. London

American International Corp., 664 F. 2d 348, 351 (2d Cir. 1981).  In determining

whether a genuine factual issue exists, the court must resolve all ambiguities and draw

all reasonable inferences against the moving party.  Anderson v. Liberty Lobby, Inc.,

477 U.S. 242, 255 (1986).

    If a nonmoving party has failed to make a sufficient showing on an essential

element of her case with respect to which she has the burden of proof, then summary

judgment is appropriate.  Celotex Corp., 477 U.S. at 323.  If the nonmoving party

submits evidence which is "merely colorable," legally sufficient opposition to the motion

for summary judgment is not met.  Anderson, 477 U.S. at 249.

    Age Discrimination

    Plaintiff alleges that her termination was the result of age discrimination in

violation of the ADEA and the CFEPA.[4]

    This is a disparate treatment case based on circumstantial evidence relative to

---

[4]The Court reviews these claims together since federal precedent concerning
employment discrimination is applicable to Connecticut's anti-discrimination statute.
See Levy v. Commission on Human Rights and Opportunities, 236 Conn. 96, 103
(1996).

plaintiff's termination.  Accordingly, the Court analyzes plaintiff's claim of age discrimination according to the burden shifting process established in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802 (1973) and Texas Dep't of Community Affairs v. Burdine, 450 U.S. 248, 252-56 (1981).

To establish her prima facie claim of age discrimination, plaintiff must demonstrate that 1) she belongs to a protected class; 2) she was performing her duties satisfactorily; 3) she suffered an adverse employment action; and 4) the adverse employment action occurred under circumstances giving rise to an inference of discrimination.  Although the plaintiff's initial burden is not onerous, she must then show that her termination was not made for legitimate reasons.  Thomas v. St. Francis Hospital and Medical Center, 990 F.Supp. 81, 86 (D. Conn. 1998).

If the plaintiff establishes a prima facie case, the defendant must articulate a legitimate, non-discriminatory business reason for the alleged discriminatory action. The plaintiff must then prove by a preponderance of the evidence that the supposed legitimate reason is actually a pretext for discrimination.  St. Mary's Honor Center v. Hicks, 509 U.S. 502, 515 (1993).

For purposes of ruling on this motion, the Court assumes that plaintiff has satisfied the prima facie case.  Defendant proffers as its legitimate, non-discriminatory business reason that plaintiff was terminated because of unsatisfactory work performance and failure to satisfy her PIP goals.  Upon thorough review of the evidentiary record, the Court finds that plaintiff has failed to demonstrate that defendant's proffered reasons for termination are pretext for age discrimination.

Plaintiff has submitted evidence of individuals who received an unacceptable

16

audit rating and of individuals reporting to Guiry who also received PAC Memos between June and November 2001.  A showing that similarly situated employees outside the protected class received more favorable treatment can serve as evidence of pretext, but only if the plaintiff shows that she was "similarly situated in all material respects" to the comparators.  Graham v. Long Island R.R., 230 F.3d 34, 39 (2d Cir. 2000).  To be similarly situated in all material respects, a plaintiff must show that the individuals were subject to the same performance evaluation and discipline standard and that these individuals engaged in comparable conduct to the plaintiff.  Hogan v. Conn. Judicial Branch, 220 F.Supp.2d 111, 119 (D. Conn. 2002).  The plaintiff must demonstrate "a reasonably close resemblance of the facts and circumstances of plaintiff's and comparator's cases, rather than a showing that both cases are identical," and their acts must be "of comparable seriousness."  Graham, 230 F.3d at 40.  Here, the plaintiff has not proved that the proffered comparators are similarly situated in all material respects.   No evidence suggests that the proffered comparators exhibited a similar level of serious performance problems as the plaintiff, including, inter alia, submission of PACs with unverifiable physician signatures or incorrect call dates, communication problems with a supervisor, or failure to meet fully the expectations of a PIP.

Even assuming that Guiry did remark that she liked to hire "young people" so that she could "mold them," plaintiff cannot prove pretext.  Defendant argues that this comment constitutes a stray remark that fails to raise an inference of pretext.  Biased comments in the workplace may be relevant and probative of discrimination.  See Reeves, 530 U.S. 133, 152 (2000).  However, stray remarks in the workplace that lack

17

a demonstrated nexus to the personnel action do not, without more, establish discriminatory intent so as to defeat summary judgment.  Abdu-Brisson v. Delta Airlines, Inc. 239 F.3d 456, 468 (2d 2001).  When "other indicia of discrimination are properly presented, the remarks can no longer be deemed 'stray,' and the jury has a right to conclude that they bear a more ominous significance."  Danzer v. Norden Sys., Inc., 151 F.3d 50, 56 (2d Cir. 1998).  In determining whether a comment is a stray remark, courts have considered 1) whether a decision-maker, supervisor, or co-worker made the remark, 2) the point in time when the remark was made in relation to the employment decision at issue; 3) whether a reasonable person could view the remark as discriminatory; and 4) whether the remark was related to the decision-making process.  Sciola v. Quattro Piu, Inc., 361 F.Supp.2d 61, 68 (E.D.N.Y. 2005).  In this instance, Guiry was plaintiff's supervisor and her evaluations of plaintiff's work influenced the decision.  However, the comment was made in March 2001 at least nine months prior to plaintiff's termination.  During her deposition, plaintiff explained that Guiry's comment was not directed at her but was made in a general context of Guiry's hiring preferences.  Thus, the remark is, without more, insufficient to establish an inference of pretext.

Accordingly, no evidence raises an inference of discriminatory animus.  In accordance with defendant's proffered reasons for terminating the plaintiff, the record attests to an employee with performance problems that did not improve during her

employment with defendant.  Summary judgment will enter in defendant's favor on
plaintiff's claims of age discrimination.

       Religious Discrimination

       Plaintiff has also alleged that plaintiff was terminated "on account" of religious
discrimination in violation of Title VII and CFEPA.

       This claim of disparate treatment is also subject to the McDonnell Douglass and
Burdine standards relevant to plaintiff's age discrimination claim as articulated above.
The Court assumes for purposes of this ruling that plaintiff has satisfied the prima facie
case.

       Defendant proffers that it terminated plaintiff due to her unsatisfactory work
performance and failure to satisfy the goals of the PIP.  Plaintiff has failed demonstrate
that this reason is pretext for religious discrimination.  Her assertion of religious
discrimination is premised largely on Guiry's alleged comment that "Jews do not
observe" the Saturday Sabbath and questioning by Lacewell about how and when she
expected to celebrate the Jewish holiday Rosh Hashanah.

       Even assuming the allegations are true, these incidents are wholly unconnected
to the personnel action at issue and fail to raise an inference of pretext.  Guiry's remark,
which occurred in July 2001, approximately six months prior to plaintiff's termination,
was made in response to plaintiff's concern that Jewish physicians could not attend
defendant's Saturday programs.  Lacewell's questions, which occurred in September,
were related to plaintiff's request for unpaid leave during the Jewish holidays.  During
her conversation with Lacewell, plaintiff's PIP was also discussed.  However, Lacewell's
questioning about the Jewish holidays raises no inference of a causal connection

                                        19

between a discriminatory animus against employees of Jewish faith and plaintiff's termination.  There is no evidence that comparable non-Jewish employees were treated more favorably or that gives rise to an inference of religious discrimination.  Summary judgment will be granted in defendant's favor on plaintiff's claims of religious discrimination.

Remaining Claims:  Breach of Implied Contract, Negligent Misrepresentation, Negligent Infliction of Emotional Distress, Retaliation Pursuant to Connecticut General Statutes §§ 31-51m and 31-51q, and Defamation

Defendant has moved for summary judgment on plaintiff's claims of breach of implied contract, negligent misrepresentation, negligent infliction of emotional distress, retaliation pursuant to Connecticut General Statutes §§ 31-51m and 31-51q, and defamation.  Plaintiff has failed to provide opposition to defendant's arguments in favor of summary judgment.  "Federal courts may deem a claim abandoned when a party moves for summary judgment on one ground and the party opposing summary judgment fails to address the argument in any way."  Taylor v. City of New York, 269 F.Supp.2d 68, 75 (E.D.N.Y. 2003).   Accordingly, the Court finds no disputed issues of fact to preclude summary judgment.

**CONCLUSION**

For the foregoing reasons, the Motion for Summary Judgment [# 44] is GRANTED.

The defendant's Motion to Strike is [#53] is GRANTED and DENIED in part.

The plaintiff's Motion to Strike [#55] is GRANTED and DENIED in part.

The defendant's Motion Re: Hearsay [# 63] is DENIED to the extent that it

requests the Court to order defendant to inform the Court which of the factual assertions were offered for the truth of the matter, but is GRANTED to the extent that the motion seeks to submit supplemental evidence and argument in support of its opposition to summary judgment.

The clerk is instructed to close this case.

So Ordered this 3d day of February, 2006.


_____/s/_____

WARREN W. EGINTON, SENIOR UNITED STATES DISTRICT JUDGE